STATE OF NORTH CAROLINA, EX REL. UTILITIES COMMISSION AND CAROLINA WATER SERVICE, INC. OF NORTH CAROLINA, APPLICANT FOR AUTHORITY TO INCREASE RATES FOR WATER AND SEWER UTILITY SERVICE IN BENT CREEK/MT. CARMEL SUBDIVISIONS, BUNCOMBE COUNTY, NORTH CAROLINA v. INTERVENOR RESIDENTS OF BENT CREEK/MT. CARMEL SUBDIVISIONS

No. 90

(Filed 27 January 1982)

1. **Utilities Commission § 38 — public utility rates — charges by affiliated companies — contracts not filed with Commission**

    The Supreme Court concurs in the holding of the Court of Appeals that G.S. 62-153 does not prohibit the Utilities Commission from considering fees owed to affiliated corporations under unfiled contracts as expenses of the public utility for purposes of ratemaking so long as the Commission does determine in the ratemaking procedure that the agreements between the utility and the affiliated corporations are just and reasonable and it does not appear that their purpose is to conceal or divert profits from the public utility to an affiliate.

2. **Utilities Commission § 51 — review of decision of Utilities Commission**

    The appellate court may reverse or modify a decision of the Utilities Commission if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions, or decisions are unsupported by competent, material and substantial evidence in view of the entire record as submitted, and an appellant may show on appeal that the Commission's order is not so supported.

3. **Utilities Commission § 38 — water and sewer utility — charges by affiliated companies — reasonableness**

    Evidence presented by a water and sewer utility and by the Public Staff supported the findings and conclusions of the Utilities Commission that

operating and general expenses allocated to the utility from affiliated corpora-
tions were reasonable. Therefore, the Commission could properly approve in-
creased water and sewer rates for the utility based in part on the expenses
allocated during the test year from the affiliated corporations.

**4. Utilities Commission § 38— utility rates—expenses charged by affiliated com-
panies—duty of Commission to inspect books of affiliated companies**

While the Utilities Commission always has the authority and right to in-
spect the books and records of affiliated companies, to investigate contracts
and practices between a utility and its affiliated companies, and to cause a
utility to offer affirmative evidence of the reasonableness of expenses charged
or allocated to the utility by affiliated companies or risk their disapproval, the
Commission has the *duty* to test the reasonableness of such expenses only
when they are properly challenged or contradicted by any party to the pro-
ceeding. G.S. 62-51.

**5. Utilities Commission § 38— utility rates—reasonableness of expenses charged
by affiliated companies—burden of going forward with evidence**

The burden on a utility of going forward with evidence of reasonableness
and justness of expenses charged or allocated to the utility by an affiliated
company arises only when the Utilities Commission requires it or when affirm-
ative evidence is offered by a party to the proceeding that challenges the
reasonableness of such expenses on the basis that they are exorbitant, un-
necessary, wasteful, extravagant, or incurred in abuse of discretion or in bad
faith or that such expenses exceed either the cost of the same or similar goods
or services on the open market or the cost similar utilities pay to their af-
filiated companies for the same or similar goods or services.

APPEAL as of right by Carolina Water Service, Inc. of North
Carolina pursuant to G.S. § 7A-30(3) from a decision of the Court
of Appeals reported at 52 N.C. App. 222, 278 S.E. 2d 761 (1981),
reversing the Order of the North Carolina Utilities Commission
approving a rate increase in Docket No. W-354, Sub 6, a general
rate-making case.[1]

On 2 July 1979 Carolina Water Service, Inc., of North
Carolina (hereinafter the "Company") filed an application with the
Utilities Commission (hereinafter "Commission") for authority to
increase its rates for water and sewer service for the Bent Creek

---

1. During the course of the hearings in the general rate case, it was discovered
that certain of the Company's service contracts with an affiliated company had not
been approved by the Commission as required by G.S. § 62-153. As a result of this
discovery, a petition was filed with the Commission by Carolina Water Service for
approval of those service contracts. The Court of Appeals affirmed the Order ap-
proving the utility's contracts with its affiliated company in No. 8010 UC 1060. No
appeal was taken from that decision.

and Mt. Carmel Acres subdivisions in Buncombe County. After appropriate public notice, interventions and hearings before a Hearing Examiner and the Commission, the Commission on 17 April 1980 entered its final order approving a rate increase. The Intervenor/Residents appealed to the Court of Appeals. That court reversed the Order of the Commission granting the rate increase, and the Company now appeals from that decision.

Multiple issues are presented by this appeal but all involve the question of the burden of proof of a petitioning utility and the duties of the Commission in a general rate case as to the reasonableness of expenses charged to that utility by affiliated companies. For the reasons stated herein, we reverse the decision of the Court of Appeals and reinstate the  order of the Utilities Commission granting the rate increase.

*Hunton & Williams, by Edward S. Finley, Jr., Attorneys for Carolina Water Service, Inc. of North Carolina, plaintiff-appellant.*

*Robert F. Orr, Attorney for Intervenor/Residents of Bent Creek/Mt. Carmel Subdivisions, defendant-appellees.*

MEYER, Justice.

In its application filed with the Commission on 2 July 1979, the Company sought to increase its rates for water and sewer service for the Bent Creek and Mt. Carmel Acres subdivisions in Buncombe County. The Company proposed an annual increase in gross revenues of $34,370 based upon a test year ending 31 December 1978.

The Company's income statement for the year ended 31 December 1978, filed as a part of its application, indicated an actual net operating loss of $31,652 which, after *pro forma* adjustments, decreased to a loss of $7,851. Under the requested increase of $34,370 the *pro forma* net operating income would have become $14,843, providing a rate of return on original cost net investment of approximately 7.66%. Prior to the hearing of the case which began on 6 November 1979, the Public Staff of the Commission and residents of Bent Creek and Mt. Carmel Acres subdivisions intervened. Accounting and engineering personnel of the Public Staff conducted audits and investigations into the Company's application, its service area, and its books of account.

At the conclusion of the hearing, the Hearing Examiner, on 19 February 1980, issued a Recommended Order and held that while the 7.66% rate of return requested by the Company would otherwise have been appropriate, the Company should be penalized 2.02% for inadequate service and should therefore receive only a 5.64% rate of return or an increase of $25,784 in annual revenues. Rates approved by the Hearing Examiner as just and reasonable had the effect of increasing the monthly charge for water to an average customer using 496 cubic feet of water per month from $9.40 to $11.00 and increasing the flat monthly sewer charge from $8.00 to $11.00. Intervenor/Residents filed exceptions to the Recommended Order and orally argued the issues before the Commission. The Commission, finding that the Recommended Order of the Hearing Examiner should be approved, filed its "Final Order Overruling Exceptions and Affirming Recommended Order" on 17 April 1980.

I

[1]   Intervenor/Residents' first argument before the Court of Appeals was the the Commission, in establishing new rates, should not have considered certain expenses allocated to the Company because they reflected charges for services rendered by affiliated companies pursuant to contracts not filed with and approved by the Commission as required by G.S. § 62-153. Intervenor/Residents argued that failure to file the contracts and seek Commission approval should result in the disallowance of expenses incurred pursuant to such contracts. The Court of Appeals, noting that because of the poor financial condition of the Company few payments had been made to affiliated companies,[2] concluded that once the Commission found the contracts to be just and reasonable there was no reason to disregard expenses incurred under such contracts. The Court of Appeals held that G.S. § 62-153 does not prohibit the Utilities Commission from considering fees owed to affiliated corporations under unfiled contracts as expenses of the public utility for purposes of ratemaking so long as the Commission does determine in the ratemaking procedure that the agreements between the utility and the affiliated corporations are

_____

2. We note that the Hearing Examiner stated in the Evidence and Conclusions For Finding of Fact Nos. 10-13 that "the Applicant has operated at a deficit and did not pay any service fees during the test period."

just and reasonable and it does not appear that their purpose is to conceal or divert profits from the public utility to an affiliate. For the reason stated by the Court of Appeals, we concur in that holding and deem it unnecessary to comment further on that aspect of this appeal.

## II

The central issue raised on this appeal is whether the Commission erred in approving the Company's increased rates for water and sewer service based in part on $27,661 of operating and general expenses allocated during the test year from affiliated companies. Resolution of this issue requires a review of the evidence presented in the ratemaking proceeding before the Commission.

Utilities, Inc., of Northbrook, Illinois, has no employees and is a holding company whose sole function is to own the capital stock of its approximately thirty-five subsidiary water and sewer operating companies located in nine states. All of the employees and the operation of all the approximately thirty-five subsidiary companies are directed by another wholly owned subsidiary, Water Service Corporation (hereinafter "Service Corporation") also located in Northbrook, Illinois. One of the wholly owned subsidiaries of Utilities, Inc., is Carolina Water Service, Inc. of North Carolina, a North Carolina corporation, which owns and operates the systems in the Lee's Ridge, Bent Creek and Mt. Carmel Acres subdivisions in Buncombe County as well as systems in subdivisions at Pine Knoll Shores located near Morehead City, North Carolina, and Whispering Pines, located near Southern Pines, North Carolina. Another of Utilities, Inc.'s, subsidiaries is Carolina Water Service, Inc., a Delaware corporation (hereinafter "CWS") which owns and operates systems in South Carolina. Another such subsidiary is Sugar Mountain Utilities, Inc. (hereinafter "Sugar Mountain") which operates a subdivision system in Sugar Mountain, Avery County, North Carolina.

The Company serves approximately 470 homes in the Bent Creek and Mt. Carmel subdivisions. To maintain the water and sewer systems and provide customer assistance, the Company employs two operating personnel who reside in that area. Service complaints from that area are handled via a toll-free telephone call by a full-time administrative secretary employed by Sugar Mountain at its office in Avery County where the manager and

assistant manager of Sugar Mountain are also located. The Company's office in the Bent Creek/Mt. Carmel Acres area consists of a mobile home adapted for use as an office, for record-keeping, and for basic lab tests. CWS provides administrative and secretarial services to the Company from its offices in South Carolina. Service Corporation, from its offices in Northbrook, pays the salaries and employee benefits such as life insurance and pension plans, etc., of all employees involved in the operation of all the affiliated companies including the two parties employed directly by the Company as well as the salaries of employees of the affiliated companies which furnish administrative, billing, computer, auditing, engineering, personnel, and accounting functions for the Company. Service Corporation furnishes such services to the Company pursuant to a contract now filed with and approved by the Utilities Commission.[3]

Among the various items of the test-year operating expenses of the Company in its application before the Commission was the $27,661 of operating and general expenses previously referred to which included the $19,471 share of the operating expenses of Service Company and the $8,190 share of the operating expenses of CWS allocated to the Company. The Company presented extensive evidence of the method by which the expenses of the affiliates were allocated as expenses of the Company and that such allocation represented a fair proportion of the costs of the affiliates. The Hearing Examiner concluded in his Recommended Order that "the allocation methods actually applied were reasonable and that the allocated general and operating and maintenance expenses derived by such allocations were reasonable, including those paid to [Service Company]." The Commission found and concluded that the Hearing Examiner's findings and conclusions "are all fully supported by the record" and affirmed the Recommended Order. Intevenor/Residents argued in the Court of Appeals that the order of the Commission approving the rate increase was unsupported by competent, material, and substantial evidence as to the reasonableness of expenses allocated to the Company by these affiliated companies. They contended that such allocated expenses could not properly be included in the Company's operating expenses because the evidence in

---

3. See footnote 1.

the record did not show that the affiliated companies incurred the allocated expenses in a reasonable manner.

While the Court of Appeals recognized that there was evidence in the record that Service Company and CWS "actually incurred these expenses," that "the Commission appears to have considered the reasonableness of the method of allocation . . .," and "that the amounts allocated to the Company was a fair proportion of the whole,"[4] that court held in effect that there was no evidence whatsoever that the expenses incurred by those affiliated companies in providing the services were just and reasonable. For reasons subsequently stated, we cannot agree.

The Commission is vested with full power to regulate the rates charged by utilities. G.S. § 62-2.

> The General Assembly has delegated to the Commission, and not to the courts, the duty and power to establish rates for public utilities. *Utilities Commission v. Telephone Co.*, 266 N.C. 450, 146 S.E. 2d 487 (1966), *citing Utilities Commission v. Champion Papers, Inc.*, 259 N.C. 449, 130 S.E. 2d 890 (1963). The rates fixed by the Commission must be just and reasonable. G.S. §§ 62-130 and 131. *See Telephone Co. v. Clayton, Comr. of Revenue*, 266 N.C. 687, 147 S.E. 2d 195 (1966). Rates fixed by the Commission are deemed *prima facie* just and reasonable. G.S. § 62-94(e).

*Utilities Commission v. Duke Power Co.*, 305 N.C. 1, 10, --- S.E. 2d ---, --- (1982).

All findings of fact made by the Commission, which are supported by competent, material, and substantial evidence, are conclusive. On appeal, the authority of the reviewing court, whether the Court of Appeals or this Court, to reverse or modify the Order of the Commission, or to remand the matter to the Commission for further proceedings, is limited to that specified in G.S. § 62-94. *Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 336, 189 S.E. 2d 705, 717 (1972).

G.S. § 62-94 specifies the standard of judicial review. Justice Carlton succinctly summarized the standard of review in such cases in *Utilities Comm. v. Oil Co.* as follows:

---

4. 52 N.C. App. 222, 230, 278 S.E. 2d 761, 766-67.

[G.S. § 62-94] provides, *inter alia*, that the reviewing court may (1) affirm, (2) reverse, (3) declare null and void, (4) modify, or (5) remand for further proceedings, decisions of the Commission. The Court's power to affirm or remand is not specifically circumscribed by the statute. However, the power of the court to reverse or modify and, *a fortiori*, to declare null and void, is substantially circumscribed to situations in which the court must find (a) that appellant's substantial rights, (b) have been prejudiced, (c) by Commission findings, inferences, conclusions or decisions which are

> (1) in violation of constitutional provisions; or
>
> (2) in excess of statutory authority or jurisdiction of the Commission, or
>
> (3) made upon unlawful proceedings, or
>
> (4) affected by other errors of law, or
>
> (5) unsupported by competent, material and substantial evidence in view of the entire record as submitted, or
>
> (6) arbitrary or capricious.

302 N.C. 14, 19-20, 273 S.E. 2d 232, 235 (1981).

[2] Pursuant to G.S. § 62-94(b)(5), the Court may reverse or modify the decision of the Commission if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions, or decisions are unsupported by competent, material, and substantial evidence in view of the entire record as submitted. An appellant may show on appeal that the Commission's order is not so supported. *Utilities Comm. v. Duke Power Co.*, 305 N.C. 1, --- S.E. 2d --- (1982); *Utilities Comm. v. Edmisten, Attorney General,* 291 N.C. 424, 230 S.E. 2d 647 (1976); *Utilities Commission v. Coach Co.*, 261 N.C. 384, 134 S.E. 2d 689 (1944); *Utilities Commission v. R.R.*, 238 N.C. 701, 78 S.E. 2d 780 (1953). This the Intervenor/Residents attempted to do before the Court of Appeals with regard to costs allocated to the Company by affiliated companies. The Court of Appeals concluded that "the Commission's order granting the requested rate increase was based in part on expenses [charged to the Company by affiliated companies] which were unsupported by competent, material, or substantial evidence as to their reasonableness," 52 N.C. App. at 232, 278 S.E. 2d at 768, reversed the Commission, and remanded the cause for further hearing.

This Court's review of the decision of the Court of Appeals is to determine whether there is error of law in that decision.[5] Upon our review of the decision of the Court of Appeals, we are required to review the whole record of the proceedings before the Commission. If upon our review we conclude, as did the Court of Appeals, that the Commission's findings and conclusions with respect to the Company's expenses charged by affiliated companies are not properly supported by evidence in the record, we will affirm that court's decision. If, however, upon that review, we find that the facts found by the Commission are in fact supported by competent, material, and substantial evidence, taking into account any contradictory evidence or evidence from which conflicting inferences could be drawn, and that the Commission's decision is not otherwise affected by error of law, we must affirm the Commission's order and reverse the Court of Appeals.

[3] We believe that the following summary of the evidence presented by the Company and the Public Staff supports the Commission's findings and the conclusion that such expenses were reasonable. Schedules and exhibits setting forth and identifying the amount of the Company's expenses for the test year, including those allocated by affiliated companies in question here, accompanied the Company's application for a rate increase which was verified by an officer acquainted with the facts appearing therein as required by Commission Rule R1-5. These schedules and exhibits were identified and admitted into evidence at the hearing. Also, well after the hearings began, and in response to a Commission order resulting from a Motion to Produce filed by Intervenor/Residents, the Company prepared and produced additional exhibits and schedules dealing with its transactions with affiliated companies. The Public Staff's engineers and auditors examined the data originally submitted by the Company and requested and received additional data from the parent company's offices. Mr. Jessie Kent, a Public Staff auditor, testified that he conducted audits of the Company both in this case and in another case approximately one year earlier. He requested and received various work papers from the Company in order to prepare his study of the case. Although he made numerous adjustments to other items, he made no adjustment in the Company's figures

---

5. *See* Rule 16 of the North Carolina Rules of Appellate Procedure.

with regard to expenses for outside services by Service Corporation.

Millard B. Shriver, Vice President and Manager of CWS, whose salary is partially allocated to the Company testified that he routinely visits the service area and is called in when the system must be changed or when facilities operate improperly. He oversees all procedures followed by the Company's operating personnel and solves problems that arise from time to time, such as engineering and treatment problems. He spot checks minor expenditures and specifically approves major ones. He considered the expenditures made by Mt. Carmel and Bent Creek to be reasonable. The Hearing Examiner concluded "that the allocation methods actually applied were reasonable and that the allocated general and operating and maintenance expenses derived by such allocations were reasonable, including those paid to [Service Corporation]." The Commission found this conclusion to be fully supported by the record and affirmed it.

During the course of the hearing on this matter, Patrick J. O'Brien, Corporate Treasurer of the Company, testified in support of the application and sponsored the exhibits and schedules that supported the relief requested. Mr. O'Brien testified that the rates under consideration were approved by the Commission on 15 November 1978 but resulted in a loss for the Company during the test year. Mr. O'Brien testified that those rates were confiscatory because they were insufficient to allow the Company to pay the interest on all of its debt, much less to provide a rate of return on the equity to the investors. Mr. O'Brien testified that operating and maintenance expenses totalling $27,661 were allocated to the Company from Service Corporation and CWS.

Mr. O'Brien testified that due to the negative rate of return experienced during the test year the Company made insufficient money to repay all of the allocated expenses. Even though the service corporation was not paid for all its services rendered, the service company did not reduce the amount of services provided. During the test year the operating loss prevented the Company from paying interest on its debt capital. He testified that the allocation *procedures* were reasonable and that operating expenses allocated from affiliated companies were reasonable and properly allocated and enabled the Company to provide service

more cheaply than if the Company had operated independently. Mr. O'Brien testified that the scheme of providing services through affiliates resulted in economies of scale that inured to the benefit of the Company.

The Intervenor/Residents offered no evidence to contradict the foregoing. We find that this evidence was competent, material, and substantial and fully supports the findings and conclusions of the Commission that the allocated expenses in question were reasonable. Having so concluded, we now examine the law applicable to this evidence.

Neither Service Corporation nor CWS carry out public utility functions in this State and are themselves neither parent nor subsidiary of the Company as those terms are defined in G.S. § 55-2 but merely affiliated companies, and, therefore they are not public utilities pursuant to G.S. § 62-3(23)(c). Neither the Commission nor the courts can constitute them as such. It follows that the Commission may not fix or control prices that Service Corporation and CWS charge their customers, including their affiliated companies. The Commission may, however, in a proper case, refuse to allow the Company to include in its operating expenses the full price it actually paid or, as the case here incurred, for services supplied by Service Corporation and CWS. *See Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 344, 189 S.E. 2d 705, 722.

[4] Within its proper rate-making authority, the Commission is expressly authorized to inspect the books and records of affiliated companies and to investigate contracts and practices between the petitioning utility and its affiliated companies including parent corporations and subsidiaries of parent corporations. The authority of the Commission to inspect books and records and to make investigations into transactions between affiliates, as conferred by statute, is quite broad:

G.S. § 62-51. *To inspect books and records of corporations affiliated with public utilities.*

Members of the Commission, Commission staff, and public staff are hereby authorized to inspect the books and records of corporations affiliated with public utilities

regulated by the Utilities Commission under the provisions of this Chapter, including parent corporations and subsidiaries of parent corporations. This authorization shall extend to all reasonably necessary inspection of all books and records of account and agreements and transactions between public utilities doing business in North Carolina and their affiliated corporations where such records relate either directly or indirectly to the provision of intrastate service by the utility. The right to inspect such books and records shall apply both to books and records in the State of North Carolina and such books and records located outside of the State of North Carolina. If any such affiliated corporation shall refuse to permit such inspection of its books and records and its transactions with public utilities doing business in North Carolina, the Utilities Commission is empowered to order the public utility regulated in North Carolina to show cause why it should not secure from its affiliated corporation such books and records for inspection in North Carolina or why their franchise to operate as a public utility in North Carolina should not be cancelled.

Thus the authority or *right* of the Commission to make such inspections and investigations is beyond question. It is the *duty* of the Commission in this regard which is at issue here. This Court is not inadvertent to the substantial risk that inflated charges by affiliated companies may improperly increase the allowable revenue of petitioning utilities and thereby raise the costs to consumers. Progressive integration of utility services under holding companies, while offering the potential for savings to the customers of subsidiary companies, at the same time offers opportunities to inflate charges for services in order to produce unwarranted profits for the holding company. Here, the Company, Service Corporation, and CWS are subsidiaries of the same holding company, Utilities Inc. of Northbrook, Illinois. We would observe, as did the New York Court of Appeals, in *General Tel. Co. of Upstate N.Y. v. Lundy*, 17 N.Y. 2d 373, 378, 218 N.E. 2d 274, 277 (1966), that:

When such materials and services are obtained through contracts which are the result of arm's-length bargaining in the open market, the contract price is usually accepted as the proper cost. However, when a utility and its suppliers are

both owned and controlled by the same holding company, the safeguards provided by arm's-length bargaining are absent, and ever present is the danger that the utility will be charged exorbitant prices which will, by inclusion in its operating costs, become the predicate for excessive rates.

The fact that services are furnished to a utility by an affiliated company does not, however, alter the ultimate question for the Commission, to-wit, whether the prices paid by the utility are reasonable. Obviously, a utility may not inflate its operating expenses recoverable through rates by paying unreasonable fees or charges for services furnished by an affiliated company. As was said by Justice Lake in *Utilities Comm. v. Telephone Co.*, citing numerous authorities, "The only effect of the affiliation between the utility and its supplier is that such relationship calls for a close scrutiny by the Commission of the price paid by the utility." 281 N.C. 318, 345-46, 189 S.E. 2d 705, 723. Justice Lake also quoted Justice Stone (later Chief Justice) from his opinion in *United Gas Co. v. R.R. Comm'n.*, 278 U.S. 300, 320-21, 49 S.Ct. 150, 156, 73 L.Ed. 390, 401 (1929), as observing:

> We recognize that a public service commission, under the guise of establishing a fair rate, may not usurp the functions of the company's directors and in every case substitute its judgment for theirs as to the propriety of contracts entered into by the utility; and common ownership is not of itself sufficient ground for disregarding such intercorporate agreements when it appears that, although an affiliated corporation may be receiving the larger share of the profits, the regulated company is still receiving substantial benefits from the contract and probably could not have secured better terms elsewhere.

The uncontradicted testimony of the Company's treasurer, Mr. Patrick J. O'Brien, was that the operating and maintenance expenses totaling $27,611 which were allocated to the company from Service Corporation and CWS were reasonable, were properly allocated, and enabled the Company to provide service more cheaply than if the Company had operated independently. He also testified that the scheme of providing services through affiliates resulted in economies of scale that inured to the benefit of the

Company. This evidence was not contradicted or even challenged[6] by any other witness. No party offered any evidence to refute this testimony nor even any evidence tending to show that the costs allocated to the Company were unusual in any way or unreasonable or that affiliation in any way raised costs to the ratepayers or resulted in unreasonable profits to the affiliated companies, Service Corporation, and CWS.

The Commission must always determine that expenses paid to affiliated companies are reasonable and the burden of persuasion on that issue always rests with the utility. The Commission, of course, has the right to test the reasonablenes of such expenses. If there is an absence of data and information from which either the propriety of incurring the expense or the reasonableness of the cost can readily be determined, the Commission may require the utility to prove their propriety and reasonableness by affirmative evidence.

As was said by the Pennsylvania intermediate appellate court in *Solar Electric Co. v. Pennsylvania Public U. Com'n*:

> Charges arising out of intercompany relationships between affiliated companies should be scrutinized with care (citations omitted); and if there is an absence of data and information from which the reasonableness and propriety of the services rendered and the reasonable cost of rendering such services by the servicing companies can be ascertained by the commission, allowance is properly refused. (Citations omitted.)

137 Pa. Super. Ct. 325, 373-74, 9 A. 2d 447, 473 (1939).

Although it always has the authority to do so, in the absence of contradiction or challenge by affirmative evidence offered by any party to the proceeding, the Commission has no affirmative duty to make further inquiry or investigation into the reasonableness of charges or fees paid to affiliated companies. While affiliation calls for close scrutiny, affiliation alone does not impose an additional burden of proof or require the presentation of additional evidence of reasonableness.

---

6. Intervenor/Residents did cross-examine the witness O'Brien but simply questioning the Company's witness is insufficient to raise the issue of harmful consequences of affiliation.

With regard to purchases from an affiliated company, Justice Lake said in *Utilities Comm. v. Telephone Co.*, "Where the purchase is made from an affiliated company, the bargaining is not at arm's length and *when the transaction is called in question*, the burden is upon the utility to show that the price it paid was reasonable." 281 N.C. 318, 346, 189 S.E. 2d 705, 723 (emphasis added).

The Kansas Supreme Court has said, "The fact that transactions take place between affiliated Companies is a matter justifying close scrutiny, but the matter should not be given any consideration in the absence of evidence of unfair dealing." *Southwestern Bell Tel. Co. v. State Corp. Com'n*, 192 Kan. 39, 83, 386 P. 2d 515, 552 (1963). The Supreme Court of Ohio, in this same context, stated:

> At the outset, it must be observed that, although the relationship of American, Western, and the company, as herein disclosed, calls for scrutiny as to whether the relationships and intercompany transactions of these companies result in unfairness, exploitation, and unconscionable gains at the expense of the public, the mere existence of such relationship cannot stand as proof of such facts. If there is such unfairness or exploitation it must be shown by evidence in the case.

*City of Columbus v. Public Utilities Commission*, 154 Ohio St. 107, 114, 93 N.E. 2d 693, 698 (1950).

The Commission has the authority and the *right* at all times to test the reasonableness of expenses paid to affiliated companies (or allocated by them) and to cause the petitioning utility to offer affirmative evidence of their reasonableness or risk their disapproval. The Commission has the *obligation* to test the reasonableness of such expenses whenever they are properly challenged.

[5] The burden of going forward with evidence of reasonableness and justness arises only when the Commission requires it or affirmative evidence is offered by a party to the proceeding that challenges the reasonableness of expenses allocated to it by an affiliated company on the basis that they are exorbitant, unnecessary, wasteful, extravagant, or incurred in abuse of discre-

tion or in bad faith or that such expenses exceed either the cost of the same or similar goods or services on the open market or the cost similar utilities pay to their affiliated companies for the same or similar goods or services. *See Alabama Public Service Com'n v. Southern Bell T. & T. Co.*, 253 Ala. 1, 23-24, 42 So. 2d 655, 674 (1949); *City of Norfolk v. Chesapeake & Potomac Tel. Co.*, 192 Va. 292, 64 S.E. 2d 772 (1951). *See also Utilities Comm. v. Telephone Co.*, 285 N.C. 671, 685-86, 208 S.E. 2d 681, 690 (1974). Reasonableness may be tested, as the Court of Appeals has stated, on the basis of (1) the cost of the same services on the open market, (2) the cost similar utilities pay to their service companies, or (3) the reasonableness of the expenses incurred by the affiliated company in generating the service.

## CONCLUSION

The Utilities Commission, upon adequate findings of fact, concluded that "the allocation methods actually applied were reasonable and that the allocated general and operating and maintenance expenses derived by such allocations were reasonable . . . ." Upon our review of the entire record of the proceedings before the Commission, we conclude that the Commission's findings and conclusions with respect to the Company's expenses charged to it by affiliated companies is indeed properly supported by competent, material, and substantial evidence in the record and therefore must be affirmed. The decision of the Court of Appeals is reversed and the Commission's Final Order is reinstated.

Reversed.